JOHN LEMLEY, Impl'd, etc.,

v.

THE GOLDEN CENSER CO.

1.  STATEMENT—BREACH OF COVENANT.—Appellant sold his house, lot and newspaper, with stock, material, good will, subscription list, etc., and covenanted not to establish or connect himself with any similar newspaper west of New York City for a year, nor at any time to interfere with the subscribers or subscription list of the newspaper sold.    Appellant started a paper at Albany within the year, and took with him a subscription list of his former paper which, it was al'eged, he used to mail to many thousands of the subscribers a copy of his new paper, to the damage, etc.    When the interest on a note given by the purchasers fell due, appellant was, it is alleged, informed by the bank of the promise of the purchasers to pay the interest on the note when produced.    Accordingly he forwarded the note to the bank in Illinois, and the purchasers commenced a suit of attachment against appellant, and summoned the bank as garnishee, and then filed a bill in equity claiming the right to have the note declared paid for the damages, etc.

Lemley v. The Golden Censer Co.

2. Same—Jurisdiction—Practice.—The court is of opinion that even if the statements in the bill were defective an l there was an adequate remedy at law, the proceedings on the part of appellant amounted to an abandonment of the objection as to jurisdiction until it was too late to renew it.

3. Same—Question of bad faith.—When appellant was seeking within that jurisdiction to collect interest upon a negotiable note not yet due, it was the right of appellee to have the note itself produced as evidence that he w is the party entitled, and appellant can not complain that the means used to procure its production, even though they were deceptive. did him any wrong, because they did not induce him to do what duty would not otherwise have demanded of him.

4. Same—Failure of consideration of note.—The consideration of the note, whether it was the tangible property, good will and covenants all together, or any or either of them, was fully received, and the subsequent breach of the covenant on the part of appellant, with whatever damage to complainant, did not amount to or produce any failure of it.

5. Damages from different causes—Burden of proof.—When the damage is occasioned by different causes from each of which there is more or less damage, if a portion of the d im ige is from causes for which the defendant is not liable, the burden of proof is on the plaintiff to show the damage from causes for which the defendant is liable as distinguished from the other causes. The court is of opinion that the finding as to the amount of the damages in this case was not sustained by the evidence. .

Appeal from the Circuit Court of Winnebago county; the Hon. Joseph M. Bailey, Judge, presiding. Opinion filed May 23, 1835.

Mr. Wm. Lathrop and Mr. A. Taggart, for appellant; that a court of equity had no jurisdiction of the subject-matter of this suit, cited Taylor v. Turner, 87 Ill. 296; Wells v. Lammey, 88 Ill. 174; 2 Story Eq. Juris., § 794.

As to failure of consideration: Gage v. Lewis, 68 Ill. 604; Kerr on Fraud and Mistake, 88; Gallagher v. Brunel, 6 Cowen, 346; Willets v. Burgess, 34 Ill. 498.

Neither a court of law or equity will take jurisdiction over property or persons in favor of those who have fraudulently induced the presence of the property or person within the jurisdiction of such court: Wanzer v. Bright, 52 Ill. 35; Kimball v. Custer, 73 Ill. 389; Townsend v. Smith, 47 Wis. 623; Drake on Attachments, Sec. 193; Pomeroy v. Palmer, 9 Iowa, 140; Dunlap v. Cody, 31 Iowa, 260.

Lemley v. The Golden Censer Co.

As to damages:   Just v. Greve, 13  Bradwell, 302; Walker v. Douglas, 70 Ill. 445.

Mr. C. M. BRAZEE, for  appellee; as  to  jurisdiction, cited High on Injunctions, §§ 55, 56; Edwards on Bills and Notes, 639; Farrington v. Frankport Bk., 24 Barb. 554.

As to failure of consideration of note:   Willard's Equity, 303, 304, 359, 360; 2 Story's Equity Jur., § 694; 3 Daniell's Ch. Pr. 1755; Kerr on Fraud and Mistake, 355; High on Injunctions, § 709; Edwards on Bills and Notes, 679.

PLEASANTS, P. J.   By an instrument under seal of Oct 6, 1877, appellant, in consideration of a certain sum to be paid in irregular installments, agreed to convey to Charles E. Mandeville and Olin R. Brouse, or  their assigns, on the first day of November then next, by bills of sale and warranty deed or bond for a deed, as they should choose, the house and lot known as the office of " The Golden Censer," a weekly religous, but undenominational newspaper which he had established and conducted for ten years in the city of Rockford, together with the furniture, engine, presses, type and other machinery, stock and material appertaining thereto, and the subscription list and good will of said newspaper; with the understanding that they would transfer the same to an incorporated company as soon as it could be organized.   A bill of sale of the personal property and rights so described was duly delivered according to the agreement, and on the 16th day of April, 1878—the company having then been organized and invested by assignment with the interest of the covenantees, and all the purchase money paid excepting the last installment of three thousand dollars—he conveyed to it by warranty deed, at their request, the real estate mentioned, and took for said balance its promissory note, payable on or before the first day of May, 1881, with annual interest at eight per cent. secured by trust deed of the same property.

By said agreement he also covenanted  to remain as managing editor in name and fact, but for the benefit and under the direction of the covenantees, until May 1, 1878, at a week-

ly salary of twenty-five dollars, and that he would not establish or connect himself with any similar newspaper west of the city of New York for one year from that date, "nor at any time interfere with the subscribers or subscription list then turned over or thereafter belonging to" the Golden Censer.

He did so remain until the 22d of April, 1878, when he removed with his family to Albany, N. Y., which is a few miles east of the meridian of New York City, taking with him, without the consent or knowledge of any officer of the Censer Co., a copy of its subscription list of April 13, 1878, and there in the early part of December following issued the first number of a similar, though monthly paper, called "Zion's Watchman." About the same time he wrote to a few of these Censer subscribers earnestly asking their aid to promote the circulation of his newspaper, and to many more sent a sample copy of the first number of it.

Upon learning something of these facts, Mr. Brouse, in the interest of the Censer Co., of which he was president, went to Albany, and on the 23d of that month, in Lemley's absence, with an officer and a search warrant, took from his house the list referred to, upon which, on all the sheets but one, were check-marks against the names of many—according to his statement nearly two thousand in all—and upon that one, besides one check in Lemley's handwriting, the words "yet to be mailed."

In the issues of the Censer of Dec. 21st and 28th were lengthy articles giving its version of the matter and denouncing appellant with great severity; and in January, 1879, Mandeville and Brouse preferred charges against him for larceny, embezzlement, lying and other misconduct, criminal and dishonorable, before the church of Albany of which he was then a member; whereof, upon a trial lasting through several weeks in February and March and conducted on their part by Brouse, who was a lawyer, he was acquitted by the conference. During this time other like articles appeared in that paper against him, and after his acquittal still others, which reflected also upon the integrity of the ecclesiastical court. Later in the year a

pamphlet of considerable size was issued by the appellee, or by Mandeville and Brouse, to all its subscribers, reviewing the case and trial, and in November a supplement devoted to the same subject and addressed and sent to those who had ceased as well as those who continued to be subscribers, with a view to regaining and retaining their support. To these publications appellant replied in his paper, and among the patrons of the Censer, who were mainly of the Methodist denomination, there was a wide division in opinion and feeling as to the merits of the controversy.

Appellee claims that in December, 1878, its subscriptions had increased after the time of the transfer by Lemley, from ten to sixteen thousand ; that between that time and the first of May, 1879, about ten thousand expired, of which nearly eight thousand were not renewed ; and that notwithstanding the new subscriptions obtained during that period there was a net loss of nearly four thousand. It appears that subscriptions were taken for a year, for six months and for three months, payable in advance, and that unless expressly renewed the paper was discontinued at the close of the subscription term. The price was $1.25 for a year, and the profit on such subscriptions in excess of seven thousand (which was the number required to meet expenses), was about sixty cents each. What proportion of those thus discontinued were for a year and what for less is not shown.

In April, 1879, appellant sent to the Winnebago National Bank for collection a draft upon appellee for the year's interest about to become due upon its note. The messenger who presented it to Mandeville, the secretary and treasurer of the company, understood from him that it would be paid upon presentation of the note and proof of Lemley's ownership, and accordingly so reported. The vice-president of the bank then wrote to that effect to Lemley, who immediately forwarded it. Thereupon Mandeville and Brouse commenced a suit by attachment against him and summoned the bank as garnishee ; and afterward, on May 3, 1879, appellee filed the bill herein, charging the breach of his covenant in the article of October 6, 1877, by purloining the list of subscribers

for the Censer, and using it to mail to many thousands of them a copy of the Watchman, to complainant's damage, by loss of such subscribers, in an amount not then definitely known but averred to exceed that of the note ; and therefore claiming the right to have it " declared paid, or as given - without consideration, or upon a consideration which has failed, and to have said trust deed also canceled and satisfied of record." It prayed that an account be taken of the number of subscribers of the Golden Censer that have subscribed to Zion's Watchman in consequence of the wrongful acts of the defendant, John Lemley, and that the amount of damage may be arrived at to which the complainant is entitled in consequence of the wrongful acts and doings of said John Lemley, and that it may be decreed * * * " that the consideration for which said note was given has fully and wholly failed," and that said note and trust deed be canceled; and for an injunction to restrain the assignment of said note or its removal out of the county of Winnebago, and for general relief.

A preliminary injunction having been awarded and served on the bank, Lemley entered a special appearance and motion to dissolve said injunction for the reasons assigned, that it was granted without notice, that the bill did not state a case warranting injunction or other relief in equity, and that the court had no jurisdiction of the matter complained of ; which motion, together with a general demurrer by the bank, was overruled on March 2, 1880. He then filed a separate answer denying the alleged breaches of covenant and thereupon again moved to dissolve the injunction ; which motion was on the 23d of October following also overruled. The bank having answered, admitting and explaining its possession of the note as above stated, replications were then filed and the cause referred to the master to take proofs; and upon final hearing on the pleadings and proofs, by depositions and oral evidence with the documents produced, on the 5th day of July, 1884, a decree was entered finding " that by reason of the deception and fraudulent and dishonest acts of the defendant, John Lemley, the consideration for which said note and trust deed were given has wholly and totally failed as in said bill alleged, and

Lemley v. The Golden Censer Co.

that the complainant is not liable thereon," and ordering that they be surrendered and canceled and the injunction made perpetual.

From this decree the defendant, Lemley, appealed, and here assigns errors covering all the points contended for in the argument.

First, that the court had no jurisdiction of the subject-matter; that the bill made only a case of damages for breach of contract by a defendant not averred to be insolvent, for which there is an adequate remedy at law.

This point was elaborately argued, but we think the appellant was not in condition to urge it. Where the subject-matter is not wholly foreign to equity this objection to its jurisdiction should be interposed in apt time and not afterward abandoned. Here the bill seeks the allowance of these damages by way of equitable recoupment, in order to extinguish and cancel a claim held by a non-resident, which is negotiable and secured by an instrument that is a cloud upon the title to real estate of the appellee. Appellant saw fit, after his first motion to dissolve the injunction on this ground was denied, to answer upon the merits without reserving the right to insist upon the objection on the final hearing; and after the like motion upon this answer was denied, he took part in all the preparation for such hearing; and not until this had been done, on the 25th of February, 1884, did he amend his answer, upon leave then asked, by adding that "the defendant claims and insists that a court of equity has no jurisdiction of the subject-matter of this suit," etc. He should not, in such a case, by answer waiving this question, put his adversary to the expense and trouble of taking testimony for a hearing upon the merits and then raise it at such hearing. We are of opinion that even if the statements in the bill were defective and there was an adequate remedy at law, these proceedings on his part amounted to an abandonment of the objection until it was too late to renew it. Stout v. Cook, 41 Ill. 448; Dodge v. Wright, 48 Id. 388; McGee v. McGee, 91 Id. 548.

It is also insisted that the court should have refused to en-

tertain the bill, because of bad faith on the part of appellee in procuring the note to be brought within the county. But the promise to pay the interest on it when produced, which is the alleged act of bad faith, is denied by Mandeville, and whether the understanding of the bank's messenger was justified by the language used is somewhat uncertain from his own testimony. Besides, when appellant was seeking within that jurisdiction to collect interest upon a negotiable note not yet due it was the right of appellee to have the note itself produced, as evidence that he was the party ent'tled. He can not, therefore, complain that the means used to procure its production, even though they were deceptive, did him any wrong, because they did not induce him to do what duty would not otherwise have demanded of him.

The remaining points may all be considered under the question whether the proof warranted the finding of the decree, or the relief thereby granted.

At the date of the decree the amount due upon the note for principal and interest, according to its tenor, was $4,492.66; the decree found that the consideration for which it was given had wholly failed, and ordered that it be surrendered and canceled.

Technically speaking, this finding was erroneous.

By the agreement of Oct. 6, 1877, it was provided, after describing the property and rights to be transferred by Lemley and reciting a payment on account thereof of $4,000, as of that date, that Mandeville and Brouse were to pay $8,743 on July 15th, $2,000 on March 1st, and $2,000 on May 1st —all in 1878—and an additional sum of $3,000, either in cash on said May 1, 1878, or partly or wholly in a note not having to exceed three years to run, with interest, etc., " making in all the sum of $14,743 purchase money for said house and lot. and newspaper office, paper, ink, etc." The note in question was given under the option thus allowed as to the last payment; and without further proof it would be understood that all of the property and covenants mentioned together constituted the consideration for the whole sum paid and to be paid, of which the note represented a part. Some attempt

was made to prove that it was given specifically for the estimated value of the good will of the Censer newspaper, but with what success we need not consider, since that actually passed to the purchasers. The bill itself makes no pretense that any item of the property agreed to be conveyed was not in existence, or not what it was represented to be, or not in fact transferr d to and fully received by Mandeville and Brouse or their assignee, the complainant, or has since been lost through any defect of title. The contrary is expressly stated. The complaint made is that after all of it had been transferred in full compliance with the agreement in that behalf, and while all that had not been consumed by use after such transfer was in the actual possession and enjoyment of complainant, the defendant, in violation of his covenant not to interfere with them, alienated a portion of its subscribers. And really, notwithstanding what is therein said about failure of consideration, the bill does not present the damages by this breach of covenant as a defense to the note, but as a distinct counter-claim which ought in equity to be applied upon it —so distinct that by an amendment made to the prayer it asks a money decree for the excess of such damage over the amount of the note.

In the argument filed in this court, however, counsel for appellee claims that the taking by appellant of a copy of the subscription list was a total deprivation of the good will, and that as the copy taken was of the list of April 13th and taken at that time while the note was delivered on the 19th, " there was not only a failure  *  *  *  but an absolute want of consideration " for it.

There is a distinction between a failure and a want of consideration. Either negatives the other. Both can not be in any case. In this there was neither, for, overlooking the assumption that the good will was the sole consideration it appears, first, that the obligation to give a note of this tenor (in default of payment of the cash on May 1, 1878, w· ich occurred) became fixed on the first of November, 1877, and hence its date or the time of its delivery is here immaterial; second, that on the 13th of April, 1878, this good will had

been fully possessed and enjoyed by the covenantees or their assignee, the complainant, without interference by appellant, from the first of November preceding, as is shown by the increase of the subscription list during that period from ten to thirteen thousand, according to the bill; and third, that the taking of the copy list on April 13th did not wholly deprive complainant of this good will, as is shown by the further increase of subscribers from that time until December following from thirteen to sixteen thousand, according to the bill. In the nature of things the mere taking of a copy list, however surreptitiously and with whatever purpose, could do no injury to complainant; and no injurious use of it is claimed to have been made until the fall or winter following the delivery of the note.

And if the covenant itself was the consideration, that too inured and still inures to the benefit of the covenantees or their assignee — being a subsisting obligation, for the breach of which adequate compensation in damages is recoverable. Willetts v. Burgess, 34 Ill. 498; Gage v. Lewis, 68, Id. 604.

So, then, the consideration of the note, whether it was the tangible property, good will and covenants, all together, or any or either of them, was fully received; and that the subsequent breach of the covenant on the part of appellant, with whatever damage to complainant, did not amount to or produce any failure of it seems clear upon reason and fully settled by the case of Gage v. Lewis, *supra*, and the authorities there cited. We therefore think this finding of the decree is unsupported.

But this is mainly a question of legal nomenclature, the determination of which does not necessarily involve the merits of the case. From a carefully prepared opinion of the chancellor, filed in the cause and incorporated in the brief of counsel, we learn that the decree was really based on what he thought " the fair inference to be drawn from all the evidence," viz., " that there remains an amount of damages resulting to the complainant from the breach by Lemley of the covenant of his agreement which  *  *  *  equals at least the amount of the note;" and we have given so much space to the idea of a total failure of consideration upon an apprehension

Lemley v. The Golden Censer Co.

that, with the further idea of finding, not definitely the actual amount of damage sustained, but whether it was not at least equal to the amount of the note, it may have contributed to make the issues between the parties and the limits of legitimate inference less distinct than they otherwise would have been in the mind of the court.

The case against appellant, as made by the bill, is breach of covenant, to complainant's actual damage, measurable in money. This is a strictly legal claim. The fact that this claim, because of certain incidents not necessarily connected with it, is prosecuted in equity with a view to modes of relief administered only there, does not entitle the claimant to any greater indulgence in respect to the kind and measure of proof to be made or presumptions to be indulged from facts proved, than would be [granted in a court of law. The breaches assigned are limited to the sending by appellant to subscribers for the Censer of a sample copy of the Watchman; the damage alleged is limited to the loss of these subscribers; and the finding is in the nature of a verdict for the claimant for the amount of the note and interest—in round numbers, $4,500.

Conceding that there was a breach in the manner charged, and also for present purposes the jurisdiction of the court, upon sufficient proof, to make the decree, the question is whether this finding as to the amount of the damages is supported by evidence.

A contract of this character may be broken times and ways without number and yet also without actual damage, because the "interference," in all the various forms it may take, may be ineffectual; and though from a breach alone law and equity alike will conclusively presume nominal damage, neither will award more without sufficient proof of it.

Upon the question of actual damage the record presents a large amount of testimony, from many witnesses, all of which is very unsatisfactory from its uncertainty as a basis for computing or estimating, or even conjecturing the amount. No attempt was made to take and state an account of the number of subscribers alienated or of the damage resulting, as was asked by the bill, nor was the slightest atten-

tion paid to the prayer for a money decree for any excess over
the note. It is not pretended that any definite number or
amount was ascertained, nor that an amount at least equal to
that of the note was definitely shown. To reach that conclu-
sion resort must be had to presumption upon presumption, or
inference upon inference, if not to suspicion upon suspicion.

We can not go over this mass of matter in detail, but only
present some general views without attempting to be more
precise or particular than may be necessary to show the reason
for our conclusion.

From the testimony on the part of complainant, considered
by itself and with all reasonable liberality, it would appear
that the subscribers for the Censer steadily grew in number
under the management of appellant from the date of its estab-
lishment until he sold it some ten years thereafter on the first
of November, 1877, when there were about ten thousand; that
they continued to increase after such sale while he remained
as managing editor, until April 13, 1878, when they had
come to be thirteen thousand; and still afterward, under the
new management, until December, 1878, when there were six-
teen thousand. About that time appellants issued the first
number of the Watchman, at Albany, N. Y., and sent a sam-
ple copy to each of many persons named in the Censer's sub-
scription list of April 13, 1878. If the check-marks found
on this list and the words "yet to be mailed" on one sheet
be accepted as sufficient to show that he had mailed a copy to
the persons respectively whose names were so checked, and
the number checked was about two thousand, these are all
that any evidence in the record tends to show he thus "inter-
fered" with. It is true that to some persons and post-offices he
sent several copies in one wrapper, but if they were to be dis-
tributed to parties named in the list their names would be
checked as if the copy had been sent to each directly, the
only object of the check being to indicate the persons supplied,
whether directly or indirectly. A few copies were also found
in the hands of persons whose names were on the list but not
checked. It is to be presumed for the reason just given that
these were either accidentally omitted, and therefore very few,

Lemley v. The Golden Censer Co.

or were received from parties other than the appellant. He had friends, not subscribers for the Censer, who took a warm interest in establishing the Watchman. For their acts in taking a number of copies and distributing them on their own motion appellant should not be charged, although some of them may thus have come to the hands of Censer subscribers. It is true also that he wrote to nine of these subscribers, whom he doubtless regarded as among his warmest personal friends, earnestly asking their aid in getting subscriptions for his new paper. If they worked among the patrons of the Censer, and might reasonably have been expected to do so, to that extent he may be chargeable; but if the names thus procured were reported before the list was seized, and appellant knew them to be on it, they also for the same reason would be checked. Allowing the full force of these facts, the number interfered with by Lemley, or with his consent or knowledge, is substantially limited by the check-marks.

This accords with other facts established in the case. Thus the printer shows that only 4,800 copies of the first number were printed, and Bronse found a pile on hand when he got the list on December 23, 1878, which he estimated at not less than two thousand; so that no more than 2,800 had been distributed, of which it appears that many were sent to persons not named on the list.

Between the first day of December, 1878, and of May, 1879, ten thousand subscriptions for the Censer expired, of which only a little over two thousand were renewed, and on the third day of the month last mentioned the bill herein was filed.

Now there is no positive proof that any declined to renew their subscriptions because of Lemley's interference, nor any circumstances tending to show it, except the increase of the list until December, 1878, and its decrease thereafter, accompanying and following the establishment of the new paper, and his proceedings in that connection as above stated. This is the sum and utmost strength of appellee's case upon its own showing, although it had within its power, in the name and address of every subscriber lost and retained, the means of making full and definite proof.

Unless, therefore, from the facts that appellant "interfered" with two thousand, and eight thousand did not renew, the court may find, as from legitimate and sufficient evidence, that the two thousand was included in the eight thousand, that he also interfered with the other six thousand (for as an inference or presumption from declension alone, which is all that is proved respecting them, it must apply alike to each, and therefore to all or none), and that his interference was in each case effectual to cause the declension—to say nothing of the uncertainty as to the terms for which they had subscribed—it is left without *data* for a computation or estimate, and to the merest conjecture of the amount of damage sustained, except as to the two thousand.

In respect to so many as were fairly shown to have been interfered with and to have declined to renew when their current term expired, it might be presumed against a willful covenant breaker, until the contrary appeared, that his interference was effectual; but to cast upon him the burden of proving the negative as to those not shown to have been interfered with, otherwise than as an inference or presumption from the fact of their declension, would seem to be unreasonable, since he could not know who were intended by the six thousand unnamed. We think the burden of proof was upon the party alleging the interference as much in respect to the six thousand as to the two thousand, and that as to them the presumption is not legally warranted by the facts stated.

Then as to the two thousand, the evidence of the check-marks, which is alone relied on to fix the number, is altogether uncertain; for, granting their significance and number to be what appellee claims, it is to be observed that they were against the names of persons who were on the subscription list of April 13, 1878, and the evidence shows that subscriptions expired and the list was corrected every week, dropping the names of such as failed to renew and adding those of new subscribers. How many expired between that date and the second week of December following—how many of the thirteen thousand embraced in the whole list, or of the two thousand checked, were included in the sixteen thousand compos-

ing the list when the interference took place—the testimony affords no means of determining even approximately. But if ten sixteenths expired between the first of December, 1878, and the first of May, 1879—a period of five months—as Brouse testifies, it is safe to presume that a good many also expired during the period of eight months, from April to December, 1878; and the number or proportion of renewals is purely conjectural.

Passing from the number interfered with to the effect of such interference, the evidence on the part of appellee leaves the amount of damage no less uncertain except as it is materially reduced.

It called as witnesses a dozen or more of its subscribers who had received—mostly from an uncertain source, by mail or otherwise—or knew of a few others who had thus received a sample copy of the first number of the Watchman. From these witnesses selected by appellee, speaking of themselves and others of whom they professed to have the knowledge, it is learned that of these recipients some continued to take the Censer and did not take the Watchman, and some took the Watchman but continued to take the Censer also. Mr. Brouse himself testifies that of the nine to whom Lemley is shown to have addressed by letter the most earnest appeals for aid in getting the Watchman into circulation, all but one, or two at most, continued to take the Censer.

If from these facts it be admissible to infer the number or proportion of those interfered with who were thereby induced to drop it, we should say it was small. Just how small is quite uncertain, but not more so than are the inferences from other facts on which appellee must rely to sustain this decree. It is entitled to be considered as of some effect to rebut inferences and presumptions of like character which were claimed and appear to have been allowed on the other side.

It is asked, how else than on appellee's theory is so great a falling off of Censer subscribers, about the time and immediately after these sample copies of the Watchman were sent out, to be reasonably accounted for?

Assuming the accuracy of Mr. Brouse's figures this falling off was indeed great and the inquiry is a natural one. An answer, at least in part, is to be found in two prominent facts presented by the record.

According to uniform experience, from the establishment of the Censer a large proportion of the subscriptions were allowed to expire at the close of the term first subscribed for; Lemley says from a third to a half, and Mandeville that " at the end of the year there are great changes in the names on the subscription list—many old subscribers do not renew." This occurs without any special dissatisfaction or interference. It is probably due in large part to the rules of the office, which admit of subscriptions for short terms and require payment in advance and the discontinuance of the paper unless the subscription is expressly renewed. When their terms expire some are sick, some absent from home, some so engrossed in business as to forget it, and some are indifferent, having subscribed mainly to get rid of solicitation; and where the paper has ceased to come for a time many lack the active interest to subscribe again. The time of this great falling off included the two periods of the close of the fiscal year and of the volume, when the largest number of subscriptions expired and the largest proportion of failures to renew is expected. If these causes reasonably account for a thousand of these failures, appellant should not be held responsible for them even though it appeared that his interference was the cause of some others.

The other fact referred to is the use by appellee of so much space in denunciation of appellant and disparaging reflection upon the conference that acquitted him, in almost every number of the paper for months from and after the 21st of December, 1878. It had been singularly free from personalities and matter of merely individual concern, and given up to news of general interest and religious information or instruction. The controversy with appellant was about a purely private and business transaction to which the subscribers were strangers. Appellee or its managers began it both in the paper and in the church. Their publications in the prose-

Lemley v. The Gold n Censer Co.

cution of it, making so wide a departure from the policy and tone previously held by the Censer, were calculated to dissatisfy and alienate some of all classes of its patrons. Those who were attached to appellant from personal acquaintance or by relations established through the paper under his management, would resent them as unjust imputations against his character. Others, indifferent to him but zealous for the Methodist church, would be offended by the reflections upon the conference. Still others, indifferent both to him and to that branch of the church, might well regard as an impertinence the presentation to such an extent of such a subject, to the exclusion of worthier matter which they had a right to expect; and all might lament and condemn in a professedly religious paper the spirit exhibited in the articles published.

That they did in fact alienate a large number admits of no doubt. The effect was confined to no locality or church denomination. Mr. Brouse says " the fight came up when we first published the facts against Mr. Lemley and he replied in his paper;" " there was a vast difference of opinion as to who told the truth—Mr. Lemley or us—all over the country;" " to give you all places where antagonisms arose I would have to have the list before me and read two thirds of the post offices; we made a very general fight over the United States and Canada ; it reached to England, Ireland and Scotland." He thinks their rejoinder of two pages to Lemley's reply "would have settled it if the church had expelled him." " No doubt if the church had done its fair duty that would have settled it forever." But the church did not expel him. Thereupon, untaught by experience, they assailed the church or its conference, and so increased the dissatisfaction. He gives the name of one place — Plattsville, Wisconsin — where " they had a large list," which " was cut down two thirds "—an extreme case, but illustrating the general effect. " We thought a good many held in abeyance until after the church trial, as to whether they would subscribe or not. They went back on us."

When therefore he says, as does Mandeville also, that

he knows of no reason for the great falling off of subscribers in the winter of 1878–9 except the wrongful acts of appellant complained of, he must be understood as referring to the remote and not to the proximate cause. And this seems to be the idea of counsel, who insists that these publications in the Censer contained only the truth and were the "natural and necessary" consequences of appellant's misconduct; and that therefore he alone is responsible for them and for their effect on others.

We can not concur in this view. If Lemley wronged Mandeville and Brouse or appellee in a private business transaction the proper resort was to a court of justice. Certainly it was not necessary to parade their views of the controversy in the paper to its subscribers who had no interest in it; and from the judgment of said subscribers or any portion of them that this course was not in accordance with good morals, good manners or good business sense, we are not disposed to dissent. There was no excuse for it, to them, but a custom which we think altogether bad. The subscribers did not drop off because Lemley wronged appellee, but because appellee abused the subscribers.

It is also gravely argued that being a religious newspaper there was a special right and duty on the part of the Censer to denounce what it believed to be sin. But this can not include a right to assume that a particular individual is a sinner in respect to a matter of private business with the editors or proprietors and thereupon to denounce him; and if it did, they must exercise or perform it at their own risk of its effect upon their patrons.

It is said that the evidence of the number of persons who discontinued the paper for this cause " is meager and unsatisfactory, and the court will not readily indulge in presumptions in favor of a party shown to be guilty of such manifest and intentional violations of his covenants as are shown in this case." And this is quite true. The extent of the defection on this account is left so uncertain as to be fairly considered conjectural. But the same is also true of the cause alleged in the bill. Here are shown a certain amount of defection and several

distinct causes for it. The existence, operation and substantial effect of each are alike proved by complainant's own testimony, and the portion due to each or to either is alike uncertain. Now, if from the nature of the case it were impossible to distinguish the particular portion, or to ascertain the proportion of the combined or common effect that is due to the cause alleged against the appellant, of course the law would not require it, but would leave it to the jury or court to estimate it as nearly as they could from the evidence. C. & N. W. Ry. Co. v. Hoag, 90 Ill. 346; Ogden v. Lucas, 48 Id. 494. Nevertheless he is liable only for the damage due to that cause, and the evidence should furnish the basis for a rational estimate and not a mere guess. In Priest v. Nicholds, 116 Mass. 401, where plaintiff's wool, stored in the basement and on the first floor of the building, was damaged in part by waste water from pipes which the defendant, occupying the floor above, negligently suffered to be out of repair, and in part by back water from the street sewer at high tide, the Supreme Court approved the following instruction: " That when the damage was occasioned by different causes, from each of which there was more or less damage to the plaintiff's wool, if a portion of the damage was from causes for which the defendant was not liable, as from the tide water, the burden of proof was on the plaintiff to show the damage to the wool from causes for which the defendant is liable, as distinguished from the other causes; and for this damage only could the plaintiff recover."

The case at bar was of a different character. Appellee recognized this in its prayer for an account of the number of subscribers lost through the wrongful act charged against appellant. It had the name and address of every one that was lost through whatever cause, and therefore the means of distinguishing the damage from this cause with reasonable certainty. If it would be tedious and expensive to make this proof, the difficulty is inherent in the nature of the covenant, which it voluntarily accepted with its infirmity, and appellee must contend with it as best he can. Certainly in such a case, the rule declared in Priest v. Nicholds should apply. Yet from the

amount allowed it would seem that it was here reversed; that the defendant was held *prima facie* responsible for the loss of all subscribers that were lost, and the burden was thrown upon him to show how much and what was due to other causes than that alleged against him.

It appears to us, then, that the evidence for appellee furnishes but little data for anything more than conjecture as to how many were the persons to whom appellant sent a sample copy of the Watchman, or how many of those to whom it was so sent were then subscribers for the Censer, or how many of such as were subscribers and received such copy declined to renew their subscriptions, or how many of those who did decline did so for the cause alleged in the bill.

We do not propose to extend this opinion—already so much longer than the writer would wish—by comments upon the testimony for appellant, further than to say that it does not relieve the case of this uncertainty touching the question of damages, and does tend to show that the amount allowed against him is at least excessive.

His use of the list, which is the only breach of his covenant charged, must have ceased when it was taken from him, Dec. 23, 1878, and no other or further "interference" is alleged or proved. Between the date of his mailing the first copy of the new paper and the commencement of this suit less than eight thousand expiring subscriptions were unrenewed, and the damages allowed equaled the entire profits on seven thousand five hundred for one year. That appellant in so short a time alienated all these by the simple means of a sample copy of the Watchman sent to one fourth of the number, is most improbable in itself and clearly contrary to the proof respecting the effect of other causes. Appellees themselves would hardly concede so much to his personal influence or to the comparative merit of his paper. But it is said, and the circuit court held, that they should be allowed for damages to be thereafter sustained as well as for all that had accrued.

While this admits that they had not then sustained damages to that amount, it does not relieve the uncertainty of the proof as to the amount they had sustained, but widens still

further the field of conjecture. It may be that in taking the account of damages the court should include the effect of all breaches prior to the decree, but we conceive that in looking for the effect of a particular breach it could not properly go beyond the subscription term next succeeding the one current at the time of such breach. It could not properly hold all defections occurring thereafter attributable to Lemley's acts in December, 1878, nor charge him in this suit with the effect of breaches subsequent to the decree. The subscriptions being for a limited term, it can not be presumed that they would have been continued indefinitely in the absence of any alleged cause of discontinuance, and the interference here charged or shown was not in its nature a permanent cause of defection.

For these reasons we hold that the finding as to the amount of the damages was not sustained by legitimate evidence. The decree will therefore be reversed and the cause remanded for further proceedings in conformity with this opinion.

Reversed and remanded.